# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 20-1891V**

|  |  |
|---|---|
| DON BROWN,<br><br>                    Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br><br>Filed: January 22, 2026 |

*Leah VaSahnja Durant, Law Offices, Washington, DC, for Petitioner.*

*Rachelle Bishop, U.S. Department of Justice, Washington, DC, for Respondent.*

### <u>RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES</u>[1]

On December 17, 2020, Don Brown filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine he received on November 13, 2019. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

Because the parties could not informally resolve the issue of entitlement and damages, they were ordered to file briefs setting forth their respective arguments and

---

[1] Because this Ruling/Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling/Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

were notified that I would resolve this dispute via an expedited "Motions Day" hearing, which ultimately took place on December 19, 2025. As discussed below, I find Petitioner entitled to compensation, and award him **$55,000.00** for actual pain and suffering, plus $195.00 (undisputed) for unreimbursable medical expenses, for a total of $55,195.00.

## I.    Procedural History

On June 27, 2023, Respondent issued his Vaccine Rule 4(c) Report contesting entitlement in this case. ECF No. 29. On October 5, 2023, I issued a Scheduling Order setting forth my preliminary findings on the case, and encouraged the parties to consider settlement, but they were unsuccessful in their efforts. ECF No. 30. Thus, on April 8, 2024, Petitioner filed her Motion for Ruling on the Record and Brief in Support of Damages ("Mot."), and Respondent filed a Response on June 7, 2024 ("Opp."). Petitioner filed a reply ("Reply") memorandum on July 8, 2024. ECF Nos. 36-41. I heard arguments from both parties during a Motions' Day Damages hearing held on December 19, 2025.

## II.    Relevant Medical History

A complete recitation of the facts can be found in the medical records, the Petition, declarations and affidavits, the parties' respective pre-hearing filings, and in Respondent's Rule 4(c) Report.

In summary, Mr. Brown was a 66-year-old shipping supervisor when he received a flu vaccine[3] in his left deltoid on November 13, 2019, through the Polk County, Iowa, Health Department. Ex. 1 at 1-2. Mr. Brown did not have a history of left shoulder pain. Mr. Brown noted in his affidavit,

> On November 13, 2019[,] at approximately 3:30 PM, I sought to obtain a seasonal flu vaccine from the 1907 Carpenter Avenue office of the Polk County Health Department, while on break from my position as a cashier/salesperson at Menards Hardware in Clive, Iowa. After filing out the normal intake form, I was called to the room where the person who was to administer the vaccine asked if I wanted the senior strength vaccine, which I had declined in the previous visits to that office.
>
> I agreed to accept the senior vaccine, not suspecting the consequences that would ensue immediately following the administration of the shot into my left shoulder. The sensation of the fluid entering, then traveling through my arm started. This tingling feeling was something that I had never

---

[3] Mr. Brown was administered a double-strength vaccine designed for people over the age of 65. Ex. 1 at 2.

2

experienced before. I began to worry about whether this dosage was too strong for my system. I drove back to work, feeling even more stress. I hoped that I could continue performing my functions at work. I tried to reconcile my feelings, saying that it would subside by the evening, but it did not. Later I told my wife what had happened and how it was affecting me. There was not only the pain of the injection, but that sensation of having the vaccine tingling down my arm to my fingers.

Shortly after, I called the Health Department explaining that my adverse reaction to the vaccine, the tingling, the feeling that the vaccine was traveling through my arm, was something I was still experiencing. They referred me to the VAERS.org website. I requested a form that was sent to me for completion. This form was completed and sent on 11/25/19.

Ex. 6 at 1-2.

On December 10, 2019 (27 days after vaccination), Mr. Brown saw his primary care provider ("PCP"), Timothy Gerdis, D.O., with complaints of numbness and tingling in his left arm since vaccination. Ex. 4 at 12. Mr. Brown reported that the injection had been painful, and that he had "persistent numbness and tingling in his left shoulder which extend[ed] down to his left elbow and wrist and fingers" since the vaccination. *Id*. He also stated he was advised by the local health department to submit a VAERS report. *Id*. Dr. Gerdis noted that:

[Petitioner] went to the Public Health Department on November 13, 2019 and had pain over 65-year-old flu vaccine which is double the dose. Since that time he's had persistent numbness and tingling in his left shoulder which extends down to his left elbow and wrist and fingers. He has never experienced any weakness in his left upper extremity. He has never noted any swelling or any bruising or any redness. Patient did call the [H]ealth Department and they sent him an email explaining to him that he should fill out an adverse reaction form.

*Id*. at 13. On physical examination, Mr. Brown displayed full range of motion ("ROM") without difficulty and normal strength in his left arm. Ex. 4 at 13. Dr. Gerdis's assessment was "adverse effect of vaccine," and he recommended ice and nonsteroidal anti-inflammatory drugs for pain. *Id*. Petitioner declined a prescription for prednisone in favor of over-the-counter pain medication. *Id*.

Slightly more than a month later, on January 13, 2020, Mr. Brown saw neurologist Michael Jacoby, M.D., for an evaluation of his left arm. Ex. 2 at 6. Petitioner stated that he "noticed a tingling sensation in [his] arm" as he received the vaccination and a tingling

3

and numbness "in the upper arm through to the fingers." *Id*. Mr. Brown described tingling as intermittent, typically lasting five to 15 minutes. *Id*. Dr. Jacoby also noted that Petitioner reported "[p]ain like the shot [which] travels down the arm." *Id*. On examination, Mr. Brown exhibited full strength in his extremities. *Id*. at 8. Dr. Jacoby's assessment was "unusual numbness sensation of the left arm" of unknown cause. *Id*. Dr. Jacoby did not feel there was a neuroanatomic explanation for Petitioner's sensation and noted that it was "[p]erhaps some type of recurrent central unpleasant memory state. Brachial plexus problem or bone possible. Perhaps this is coincidence [i.e.] association with injection but underlying arm pathology." *Id*. Dr. Jacoby recommended physical therapy ("PT"). *Id*.

On January 20, 2020, Mr. Brown underwent upper arm electromyography ("EMG") testing. Ex. 2 at 11. The results revealed a left median neuropathy at the wrist compatible with left carpal tunnel syndrome ("CTS"), and PT was recommended. *Id*. at 8, 12.

On February 4, 2020, Mr. Brown saw Kerri Hardy, PT, DPT, at Core Physical Therapy for an initial evaluation. Ex. 3 at 7. Petitioner reported his pain was currently a 5/10, and was a 0/10 at best, and an 8/10 at worst. *Id*. He again reported painful tingling from shoulder to fingers intermittently ("like getting the shot all over again") since his vaccination. *Id*. The tingling radiated into his fingers and thumb. *Id*. On physical examination, Mr. Brown's cervical ROM was reduced at 75-80%, but his upper extremity shoulder active ROM was within normal limits. *Id*. at 8. Petitioner had minimal to moderate decreased "mobility/resiliency" in his left cervical collar into his left shoulder girdle. *Id*. The assessment was "impaired range of motion, strength, and joint mobility which is consistent with the listed diagnosis," and PT was recommended one to two times a week for eight weeks.

On February 10, 2020, Mr. Brown returned to Dr. Gerdis for evaluation of a pinched nerve in his lower back, and was diagnosed with acute left-sided back pain. Ex. 4 at 10-11. On February 14, 2020, Mr. Brown requested a note from his PCP for work restrictions due to his back pain. *Id*. at 8. Petitioner returned on February 20, 2020, for further evaluation of his low back pain, which he attributed to a lifting injury three weeks prior. *Id*. at 4. Mr. Brown did not discuss any shoulder pain at this appointment, and Dr. Steinmetz recommended PT for Petitioner's lower back. *Id*. at 7.

On February 25, 2020, Mr. Brown returned to Core Physical Therapy for ongoing treatment of his left shoulder pain. Ex. 3 at 12. At that time, Therapist Hardy noted there was "[s]till no real change in the arm. It kicks in randomly and just hasn't changed much." *Id*.

On March 26, 2020, Mr. Brown returned to Mercy One Ruan Neurology Care for an MRI of the left upper extremity. Ex. 2 at 9. The clinical record notes "numbness, tingling and weakness left arm, gradually worsening since shot in left arm in 11/2019." *Id*.

(emphasis added). The impression on the MRI report noted that "no left brachial plexus abnormality is identified." *Id*.

On May 20, 2020, Mr. Brown saw orthopedic surgeon Stephen A. Ash, M.D., at Iowa Ortho for an evaluation of his left arm. Ex. 5 at 8. Petitioner complained of intermittent numbness and tingling and pain in his left arm when reaching and lifting. *Id*. Dr. Ash noted that:

> [Petitioner] complains of some numbness and tingling in the LEFT upper extremity, as well as shoulder pain that started in November 2019 after he had a flu shot. He complains of intermittent numbness that comes and goes. The LEFT shoulder has been painful at times for reaching and lifting activities. He saw a physical therapist for the shoulder and has worked on some exercises.

*Id*. On physical examination, Mr. Brown did exhibit a decreased range of motion of the left shoulder, although he had "minimal pain" with Hawkins and Neer impingement maneuvers and a negative Spurling's test on the left. *Id*. Dr. Ash's assessment was left shoulder pain of unspecified chronicity, pain in unspecified limb, and left shoulder impingement syndrome and left CTS. *Id*. at 10. Dr. Ash recommended that Mr. Brown obtain an MRI tailored to his shoulder. *Id*. However, given that Petitioner had good strength, and it was unlikely there was any significant rotator cuff tearing, Mr. Brown elected to wait. *Id*. Dr. Ash discussed future treatment, including more PT and/or a cortisone injection if Petitioner's symptoms did not improve. *Id*. Dr. Ash determined that, because of the COVID-19 Pandemic, it was better for Mr. Brown to wait before engaging in further in-person physical therapy. *Id*. Dr. Ash further noted that he would "see [petitioner] back on an as-needed basis in a month or 2 if he is not improving at which time we may consider a subacromial injection on the LEFT if he still has shoulder pain." *Id*.

On June 10, 2020, Mr. Brown returned to Iowa Ortho to see orthopedic surgeon and hand and upper extremity specialist, Benjamin Paulson, M.D. Ex. 5 at 11. Dr. Paulson noted that

> [Petitioner] is here today with complaint of numbness and tingling into this LEFT arm…He was referred here by Dr. Ash, who he is seeing for shoulder pain. This all seemed to start after getting a flu shot in November. His pain seems to go up and down his arm. This seems to be consistent since November. He has no treatment for this. No specific trauma.

*Id*. Mr. Brown reported that his left arm pain was now at a severity of 4/10. *Id*. He also described numbness and tingling in his left arm, and pain that "seems to go up and down

5

[the] arm." *Id*. On examination, Mr. Brown had normal strength and ROM in his upper left extremity, and a positive left Tinel's. *Id*. at Dr. Paulson's assessment was left CTS, and he recommended that Petitioner wear a CTS brace at night. *Id*. at 13-14.

There is a subsequent, two year and four-month gap in the filed medical records On October 27, 2022, Mr. Brown returned to Dr. Paulson. Ex. 7 at 1. At that time, Dr. Paulson wrote that he had seen Petitioner in the past for "for LEFT CTS with bracing, which resolved his pain. He states his whole arm pain and tingling has returned today." *Id*. Dr. Paulson's assessment was left CTS and left arm pain. *Id*. After discussing his options, Mr. Brown decided that he would continue with PT. *Id*.

Mr. Brown started PT at Select Physical Therapy on October 27, 2022. Ex. 10 at 2. His initial diagnosis was left CTS with upper extremity pain and tingling. *Id*. Mr. Brown reported his pain was a 3/10 currently, a 2/10 at best, and a 4/10 at worst. *Id*.

Mr. Brown attended 11 sessions between October 27 and November 23, 2022. *Id*. at 2-33. On November 28, 2022, Petitioner saw Dr. Paulson again. Ex. 7 at 4. Mr. Brown reported his symptoms were now a 0/10 in severity. *Id*. He was doing well and finding relief from his symptoms with PT with "little to no pain." *Id*. Petitioner further denied any numbness and tingling. *Id*. His diagnosis remained CTS. *Id*. at 5. Petitioner attended an additional eight PT sessions between December 1, 2022, and was discharged on December 25, 2022. Ex. 10 at 36-62.

On December 13, 2022, Mr. Brown returned to Dr. Ash for a follow-up appointment. Ex. 7 at 6. Petitioner reported continued intermittent left shoulder pain with reaching and lifting activities. *Id*. On examination, he had 165 degrees of active elevation bilaterally and 45 degrees of external rotation bilaterally. *Id*. at 7. He had mild pain with Hawkins and Neer impingement maneuvers, but his acromioclavicular ("AC") joint was nontender and he had a negative Spurling's maneuver on the left. *Id*. Dr. Ash noted that Petitioner's left shoulder x-ray showed some AC joint narrowing, a type II acromion and trace glenohumeral joint space narrowing. *Id*. His diagnosis was left shoulder pain and "left shoulder impingement syndrome versus possible cuff tear." *Id*. Dr. Ash discussed the possibility of rotator cuff pathology and wanted Petitioner to undergo additional imaging to assess the left rotator cuff. *Id*.

On January 3, 2023, Mr. Brown underwent a left shoulder MRI which revealed "potentially symptomatic os acromiale given subchondral edema along both sides of the synchondrosis as well as the adjacent AC joint," and an intact rotator cuff. Ex. 8 at 4. Dr. Ash noted that Petitioner had degenerative changes at the AC joint, an intact rotator cuff, and no evidence of a displaced labral tear. *Id*. at 1. There were mild degenerative changes of the shoulder and no evidence of abnormality in the deltoid or soft tissue. *Id*. On

6

examination, Mr. Brown's ROM remained the same bilaterally. *Id*. Petitioner's diagnosis was "left shoulder pain, question component of impingement syndrome and mild osteoarthritis. Asymptomatic AC joint arthrosis and os acromiale." *Id*. Mr. Brown did not feel his symptoms were bad enough to regularly take anti-inflammatories or consider an injection, and Dr. Ash wrote that he did not "see something structural on the MRI that needs to be addressed." *Id*. The plan was for Petitioner return on an as-needed basis. *Id*.

Mr. Brown returned to Iowa Ortho over one year later, on February 26, 2024, and saw Dr. Paulson for his left arm. Ex. 8 at 5. Petitioner continued to report numbness and tingling in his thumb, second, third, and fourth digits of his left hand and of the left shoulder. *Id*. Dr. Paulson wrote that Petitioner's symptoms "started shortly after he received a vaccination in the left arm in 2019." Id. On examination, Mr. Brown had a positive Tinel's at his left wrist. *Id*. at 6. Dr. Paulson's assessment remained left CTS; treatment options, including a steroid injection or surgical management were discussed. *Id*.

### III.    Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *See Cucuras v. Sec'y of Health & Human Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[4] a petitioner must

---

[4] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited

establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

---

exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

## IV.    Ruling on Entitlement and Damages

After listening to the arguments of both sides, I issued an oral ruling on both entitlement and damages constituting my findings of fact and conclusions of law, pursuant to Section 12(d)(3)(A), at the conclusion of the December 19, 2025 hearing. An official recording of the proceeding was taken by a court reporter. I hereby fully adopt and incorporate that oral ruling as officially recorded.

### A. Entitlement

Respondent has contested entitlement, arguing that there is not preponderant evidence to show that (1) Petitioner experienced shoulder pain within 48 hours of vaccine administration, (2) Petitioner had documented limited range of motion in his affected shoulder, and (3) Petitioner's pain and reduced range of motion were limited to the shoulder in which the vaccine was administered. Opp. at 8-15. He also maintains that Petitioner's CTS diagnosis is an alternative explanation for his presentation.

### a.  Onset

Regarding onset, Respondent argues that "[a]t best, Petitioner's medical records reflect an equivocal onset of intermittent pain some time 'after' vaccination." Opp. at 11. However, the record offers more discernable context regarding onset than Respondent contends. Thus, on December 10, 2019, Petitioner presented to MercyOne Clive Family Medicine Clinic, representing as follows:

> Patient states having the flu shot on Nov 13th and since then he has been experiencing numbness and tingling on the left arm . . . Patient states he went to the Public Health Department on November 13, 2019 and had pain over 65-year-old flu vaccine which is double the dose. Since that time he's had persistent numbness and tingling in his left shoulder which extends down to his left elbow and wrist and fingers.

Ex. 4 at 13. Then, on January 13, 2020, Petitioner reported to MercyOne Ruan Neurology Care for an evaluation of his left arm. Ex. 2 at 6. The record from this visit states:

9

> **History of Present Illness**… 66 right handed male presents for evaluation of let arm. Started after a flu vaccine November. Noticed a tingling sensation in the arm as the shot was administered on November 13, 2019. Since, has noticed same tingling sensation in the arm with numbness and weakness in the upper arm throughout fingers… Pain like the shot travels down the arm. Comments about weakness during this time and has noticed that with numbness doesn't' have the ability to lift "up to my capacity . . . " Has not improved since the event…

*Id*. A February 4, 2020 physical therapy note states "Date of onset: 11-13-2019 … Mechanism of Injury: got a senior strength flu shot and has felt painful and tingling form shoulder to fingers intermittently ever since." Ex. 3 at 7. An MRI report from the following month states "Clinical Indication: 66-year old; numbness, tingling and weakness left arm gradually worsening since shot in left arm in 11/2019." Ex. 2 at 9 And a May 20, 2020 record from Iowa Ortho states "History of present illness: 1. Left arm pain. Onset: 11/13/209 . . . He complains of some numbness and tingling in the LEFT upper extremity, as well as shoulder pain that started in November 2019 after he had a flu shot." Ex. 5 at 8.

Witness statements are consistent. Petitioner describes the tingling and pain sensation in his shoulder as the vaccine was injected into his left arm. Ex. 6 at 1. He adds that "[t]here was not only the pain of the injection, but that sensation of having the vaccine tingling down my arm to my fingers." *Id*. He completed a VAERS form on November 25, 2019, just 12 days post vaccination. *Id*. And the lack of concrete instances in which Petitioner stated his onset of pain began "within forty-eight hours of vaccination" is hardly dispositive. As noted in the factual summary above, there are several references in the medical records that specifically list the date of onset as November 13, 2019, *the date of vaccination*. And there are no conflicting statements or reports in the record that set the onset of Petitioner's shoulder pain *outside* the 48-hour window. The weight of this evidence favors a Table-consistent onset.

Respondent also seems to argue that because Petitioner's complaints of *shoulder* pain are coupled with complaints of numbness and tingling in the *arm*, that it somehow discounts his complaint of immediate shoulder pain. This is simply not true. The QAI for SIRVA simply states that "pain occurs within the specified time-frame…" The fact that Mr. Brown's complaints of shoulder pain are accompanied by his complaints of other symptoms does not eliminate the presence of shoulder pain complaints. Thus, I find that the evidence demonstrates that Mr. Brown did complain of shoulder pain as a result of his vaccination, and identified onset as beginning within the specified time frame as described above. Thus, the weight of this evidence favors a Table-consistent onset.

### b.  Reduced range of motion

Respondent has also argued that Petitioner did not have documented limited range of motion in his affected shoulder. However, the record *does* document, on at least one occasion, that Mr. Brown presented with a reduced range of motion of his affected shoulder. For example, in Ex. 3 at 9, the record states that Mr. Brown "presents with impaired range of motion, strength, and joint mobility which is consistent with the listed diagnosis." In addition, in Ex. 3 at 8, PT Hardy states, "[t]he patient presents with *impaired range of motion*, strength, and joint mobility which is consistent with the listed diagnosis [Pain in left arm]." *Id*. at 17 (emphasis added). Also, Petitioner's orthopedist measured the range of motion of Petitioner's left shoulder in Ex. 5, page 9, and range of motion deficits of the left shoulder are noted. As I discussed during the hearing, the QAI only states that reduced range of motion must be shown to exist *at some point,* and be limited to the shoulder in which the intramuscular vaccine was administered. There is no qualification as to the number of times that reduced range of motion must be present. I thus find that Petitioner has satisfied this criterion for a SIRVA injury.

### c.  Pain and Reduced Range of Motion Not limited to Shoulder

Respondent's other Table objection - that Petitioner's pain and reduced range of motion is not limited to the shoulder in which the vaccine was administered - is a stronger argument, but ultimately not a successful objection. A close look at the record demonstrates that Petitioner's symptomology included areas outside the left deltoid region and reflected complaints of numbness and tingling, not pain. *See* e.g., Ex. 3 at 12 (complaints of left arm numbness and tingling extended into the elbow, wrist, and fingers); Ex. 3 at 6 (complaints of left arm tingling which extended into his left hand, fingers, and thumb). The references to pain and limited range of motion are more specifically limited to the left shoulder. *See e.g.* Ex. 3 at 7 ("L[eft] arm pain in muscle below shoulder/in L[eft] upper arm – tingling radiates down L[eft] arm into fingers and or thumb.) (emphasis added).

In addition, Petitioner was assessed with left shoulder impingement syndrome, a common symptom of a SIRVA injury. Ex. 5 at 10. And it appears from the record that many of his left arm complaints could be deemed to have started with his shoulder. *See* supra, Ex. 3 at 7; Ex. 5 at 89 ("He complains of some numbness and tingling in the LEFT upper extremity, as well as shoulder pain that started in November 2109 after he had a flu shot … The LEFT shoulder has been painful at times for reaching and lifting activities"). To the extent that complaints of pain related to areas outside the deltoid region, they bear on damages – but for purposes of entitlement, the totality of the evidence still establishes pain primarily in the affected shoulder.

11

**d. Alternative explanation for Petitioner's symptoms**

Finally, Respondent argues that Petitioner's CTS explains his symptoms, such as the numbness and tingling in his left shoulder, down to his arm and hand. Opp. at 13. But this diagnosis can be differentiated from the SIRVA evident in this record. While Mr. Brown may have had CTS, its diagnosis and treatment are distinguishable from his shoulder injury and do not impede his SIRVA claim. I thus find that Petitioner has satisfied the QAI criteria for a SIRVA claim.

Even if a petitioner has satisfied the requirements of a Table injury or established causation-in-fact, he or she must also provide preponderant evidence of the additional requirements of Section 11(c), *i.e.*, receipt of a covered vaccine, residual effects of injury lasting six months, etc. *See generally* § 11(c)(1)(A)(B)(D)(E). But those elements are established or undisputed. Thus, based upon all of the above, Petitioner has established that he suffered a Table SIRVA, satisfying all other requirements for compensation.

## B. Damages

### a. Legal Standard

Compensation awarded pursuant to the Vaccine Act may include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no precise formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.  *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of*

*Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

A special master may also look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in each case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, a special master may rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

### b.  Appropriate Compensation in this SIRVA Case

### i.  Awareness of Suffering

Neither party disputes that that Mr. Brown had full awareness of his suffering, and I find that fact is supported by the record evidence.

### ii.  Severity and Duration of Pain and Suffering

As I noted during the Motions Day hearing, and as is incontestable from the record, Mr. Brown's SIRVA did <u>not</u> require surgical intervention. And it has been the consistent practice in SPU matters involving SIRVA cases not resulting in surgery to award less than six figures for pain and suffering, absent special circumstances. Although Petitioner has requested $110,000.00 in pain and suffering, I do not find that the necesssary extraordinary circumstances exist in this case to justify such an award.

Mr. Brown's SIRVA injury appears to have been mild to moderate, characterized by intermittent pain and weakness, limited physical therapy, and no steroid injections. While Mr. Brown reported his injury fairly quickly (just 27 days after vaccination), some of his more severe symptoms experienced later in treatment appeared to be associated with comorbid conditions that cannot be attributed to his SIRVA – his CTS, as well as lower back pain and wrist pain (Ex. R at 14-15). There was also a two-year gap in treatment (beginning not long after the six months, post-onset "severity cutoff") which is consequential, and highlights the overall moderate nature of the injury at issue, since Petitioner was able to tolerate it for so long after some early treatment. I conclude instead

13

that the bulk of Mr. Brown's SIRVA-associated pain likely resolved before this long gap in treatment.

Petitioner has cited to two cases in support for his claimed amount for pain and suffering, *Danielson v. Sec'y of Health & Human Servs*., No. 18-1878, 2020 WL 8271642 (Fed. Cl. Spec. Mstr. Dec. 29, 2020) and *Cooper v. Sec'y of Health & Human Servs*., No. 16-1387, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018). I first note that both the *Danielson* and *Cooper* cases were issued before the Motion's Day procedure was instituted approximately five years ago. Since then, hundreds of SIRVA decisions have been issued to hopefully assist the parties with their informal settlement discussions. These older SIRVA decisions thus reflect more of an *ad hoc* analysis that is not in line with the reasoning from more recent decisions.

In addition, the amount awarded in the *Danielson* case is too high, as that petitioner had a more severe injury and more treatment. For example, the *Danielson* petitioner received three steroid injections, underwent many chiropractic and PT appointments, and experienced daily pain for more than two years. The petitioner in that case reported significant levels of pain of eight and nine out of ten, with rest and activity respectively. *Danielson,* 2020 WL 8271642 at *8. The *Danielson* petitioner also received an award for future pain and suffering demonstrating the ongoing nature of her injury. *Id*.

In the *Cooper* case, a petitioner was awarded $110,000.00 in damages for past pain and suffering. But that petitioner had a more severe injury and more treatment. The *Cooper* petitioner reported very high levels of pain (documented as between a 7/10 and 10/10) during PT, and found little relief despite extensive PT. *Cooper,* 2018 WL 6288181 *4.

By contrast, Respondent cites to 10 cases,[5] reflecting an awards range from $37,500.00 to $65,000.00. Although Respondent never proposed in briefing a precise counter-figure for pain and suffering, at hearing he agreed that an award of $37,500.00, would be appropriate for Mr. Brown in this case.

---

[5] *Valdez v. Sec'y of Health & Human Servs*., 21-394V, 2024 WL 1526536 (Fed. Cl. Spec. Mstr. Feb. 28, 2024), *McGraw v. Sec'y of Health & Human Servs*., 21-72V, 2024 WL 1160065 (Fed. Cl. Spec. Mstr. Feb. 15, 2024), *Ramos v. Sec'y of Health & Human Servs*., No. 18-1005V, 2021 WL 688576 (Fed. Cl. Jan. 4, 2021), *Mejias v. Sec'y of Health & Human Servs*., No. 19-1944, 2021 WL 5895622 (Fed. Cl. Spec. Mstr. Nov. 11, 2021), *Kleinschmidt v. Sec'y of Health & Human Servs*., No. 20- 0680V, 2023 WL 9119039 (Fed. Cl. Spec. Mstr. Dec. 5, 2023), *Green v. Sec'y of Health & Human Servs*., No. 20-0378V, 2023 WL 6444421 (Fed. Cl. Spec. Mstr. Sept. 1, 2023), *Aponte v. Sec'y of Health & Human Servs*., No. 20- 1031V, 2022 WL 4707180 (Fed. Cl. Spec. Mstr. Sept. 2, 2022), *Klausen v. Sec'y of Health & Human Servs*., No. 19- 1977V, 2023 WL 2368823 (Fed. Cl. Spec. Mstr. Feb. 2, 2023), *Foster v. Sec'y of Health & Human Servs*., No. 21- 0647V, slip op. (Fed Cl. Spec. Mstr. Feb. 6, 2024), *Henderson v. Sec'y of Health & Human Servs*., No. 20- 1261V, 2023 WL 2728778 (Fed. Cl. Spec. Mstr. Mar. 31, 2023).

Of the cases referenced by Respondent, I find that *Valdez* and *Henderson* are the best comparables. The *Valdez* petitioner had a similar presentation to Mr. Brown, where in addition to reporting shoulder pain, she also reported that she was experiencing pain that radiated down her arm. 2024 WL 1526536, *2. The *Valdez* petitioner had a moderate SIRVA injury and underwent conservative treatment. *Id*. at 3. And similar to Mr. Brown, the *Valdez* petitioner declined a steroid injection that was offered to her, stating that "her symptoms [were] not severe." *Id*. at 3-4. Ms. Valdez was awarded $35,000.00 in pain and suffering.  Because Mr. Brown's case is also case involving very conservative treatment, i.e., a seven-month treatment course, three steroid injections, and only eight physical therapy sessions and medication, I do find that the *Valdez* case is a very good comparable case. Similarly, in *Henderson*, a petitioner suffered a moderate SIRVA injury for approximately 11 months. Simultaneously, she exhibited pain and tightness in other areas – such as her neck, back, and thighs - which appeared unrelated to her SIRVA injury. The *Henderson* petitioner was awarded $65,000.00, for her pain and suffering.

Based on all the circumstances and evidence submitted, I find that Petitioner's past pain and suffering warrants an award of $55,000.00.

### iii.  **Unreimbursable expenses**

The parties have agreed that Petitioner has submitted preponderant evidence to support $195.00 in past out-of-pocket expenses related to his shoulder injury, and I shall award that amount. Opp. at 24-25.

### Conclusion

Based on my consideration of the complete record as a whole and for the reasons discussed in my oral ruling, pursuant to Section 12(d)(3)(A), **I find that Petitioner is entitled to compensation and that $55,000.00, represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[6]**

**Accordingly, I award Petitioner a lump sum payment of $55,195.00 (consisting of $55,000.00 for his actual pain and suffering plus $195.00, for unreimbursable medical expenses), to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner**. This

---

[6] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with the Decision.[7]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[7] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.